# AGREEMENT AND RELEASE

**NOW COMES** Apreamare S.p.A., an Italian business entity having a principal place of Business located at Via Terragneta 72, 80058 Torre Annunziata (NA), Italy (hereinafter referred to as "Apreamare") and MYI International, Inc. d/b/a Florida Yachts International, having a principal place of business located at 2550 S. Bayshore Dr, Suite #2, Miami FL 33133 (hereinafter referred to as "FYI");

**WHEREAS** FYI purchased two Apreamare vessels, an Apreamare 48, HIN MYF48C27E112 (hereinafter referred to as "The 48") and a Maestro 82, HIN MYF82M04E112 (hereinafter referred to as "The 82", and collectively as "The Vessels") for a total consideration of 1,800,000 Euro paid to Apreamare;

**WHEREAS** FYI had The Vessels surveyed prior to their purchase, and the surveyor issued a survey report which identified a number of issues with The 48 and The 82. See the "Findings and Recommendations" relating to The 82, attached hereto as Exhibit "A" (hereinafter referred to as "the 82 Survey Report"). See also the "Findings and Recommendations" relating to The 48, attached hereto as Exhibit "B" (hereinafter referred to as "the 48 Survey Report").

**WHEREAS** The 82 Survey Report lists a total of 43 items requiring repair or other intervention on the 82 (hereinafter referred to as "The 82 Issues");

**WHEREAS** The 48 Survey Report lists a total of 24 items requiring repair or other intervention on the 48 (hereinafter referred to as "The 48 Issues");

**WHEREAS,** a copy of the Apreamare warranty for the 48 and the 82 is attached hereto as Exhibit "C".

**WHEREAS** FYI has submitted a warranty claim for The 48 Issues and The 82 Issues;

**WHEREAS** FYI controlled the repair or other intervention of The 82 Issues and The 48 Issues;

**WHEREAS** Apreamare has inspected the repairs or other intervention of The 82 Issues and The 48 Issues;

**NOW, THEREFORE, FOR AND IN CONSIDERATION** of the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged:

    1.    Apreamare will pay to FYI the total sum of $160,000 to fully, finally and completely compensate FYI for any cause, matter or thing whatsoever arising out of or otherwise related to, directly or indirectly, to The 82 Issues or The 48 Issues.

    2.    FYI, on behalf of itself and its officers, directors, shareholders, employees, professionals, principals, personal representatives, attorneys, successors, affiliates, subsidiaries,

partners, heirs, beneficiaries, assigns and/or privies, including but not limited to Ralph Navarro (hereinafter referred to as the "Releasors") do hereby fully and finally compromise and settle with, release, acquit and forever discharge Apreamare of and from any and all claims, demands, debts, damages, loss of profits, costs, contract damages, loss of income, damages to reputation, bad faith damages, exemplary damages, punitive damages, attorneys' fees, costs, interest, suits, dues, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, extents, executions, sums of money, actions, rights, obligations, liabilities, verdicts, judgments, taxable costs, claims, warranty claims, warranties, causes of action or suits in law, admiralty, contract or equity, of whatever kind or nature, known, unknown or unforeseeable (hereinafter referred to as "causes of action"), which Releasors ever had, now has, or hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever arising out of or otherwise related to The 48 Issues and/or The 82 Issues.

3.      By execution of this Agreement and Release, Releasors expressly waive any and all rights which may extend to claims which they do not know or suspect to exist in their favor at the time of executing this Agreement and Release the release with regard to The 82 Issues and/or The 48 Issues, which if known by Releasors may have materially affected their settlement as recited herein. In connection with such waiver and relinquishment, Releasors acknowledges that they are aware that they may hereafter discover claims or facts in addition to or different from those which they now know or believe to be true with respect to the matters related herein, but that it is their intention hereby fully, finally, and forever to settle and release all such matters and claims relative thereto which existed, do exist, may exist or heretofore may exist. In furtherance of such intention, the releases herein given shall be and remain in effect as full and complete releases of any such additional or different claims, facts or causes of action relative thereto regarding The 48 Issues and/or The 82 Issues.

4.      Apreamare and FYI recognize and agree that, even though repaired, the possibility exists that one or more of items identified as The 82 Issues and/or The 48 Issues may require repair or other intervention in the future (hereinafter referred to as the "Renewed Issues") during the term of the Apreamare warranty. In this event, Releasors alone are responsible to effect any necessary repairs or other intervention to the Renewed Issues, and are responsible for any associated costs, fees or other expenses, and will defend, indemnify and hold harmless Apreamare from any causes of action regarding The 82 Issues, The 48 Issues and/or any Renewed Issues. **The 82 Issues, The 48 Issues, and/or any Renewed Issues are not and will not be covered by any Apreamare warranty, express or implied, and are expressly disclaimed.** Releasors will defend, indemnify and hold Apreamare harmless from any future causes of action arising out of or otherwise relating to The 82 Issues, The 48 Issues, and/or any Renewed Issues. In the event Apreamare is notified of a Renewed Issue, Apreamare will within two (2) business days notify Releasors of such Renewed Issue. If Releasors to not take the appropriate action to effect the necessary repairs and/or other intervention as necessary with three (3) business days of notification, Apreamare will take the necessary action to address the Renewed Issues and submit any related invoice(s) to Releasors for immediate payment.

5.      This Agreement and Releases shall inure to the benefit of Apreamare and Releasors and shall be binding upon Apreamare and Releasors, their successors and assigns. This Agreement and Releases may not be changed orally. This Agreement and Releases constitutes the entire

agreement between Apreamare and Releasors. There is no other agreement, written or oral, express or implied, between Apreamare and Releasors. The terms of this Agreement and Releases are contractual, not merely recitals.

6.     Apreamare and Releasors hereby waive all mistakes of fact or law which may have influenced them in entering into this Agreement and Releases. Apreamare and Releasors further agree that the payments of the consideration recited herein does not constitute an admission of any liability by any party and that all parties expressly deny any liability. Said payment in settlement and compromise is made to terminate further controversy respecting all claims.

7.     FYI represents that it is the sole owner of The 48 and The 82 and that it has not sold, assigned, transferred or otherwise encumbered any interest whatsoever in The 82 or The 48.

8.     Apreamare and Releasors hereby warrant, represent and agree that they are the sole parties authorized to enter into this agreement, and that they have not heretofore assigned, subrogated or transferred, or purported to assign, subrogate or transfer to any person, firm, partnership, governmental entity, insurer, corporation, lawyer, law firm or other entity whatsoever any rights or other causes of action arising out of or related to this matter. In the event that any causes of action is made or initiated because of any purported assignment, transfer, or subrogation of any of the rights or causes of action hereinabove released, the party making such assignment transfer or subrogation warrants, represents, and agrees to indemnify, defend and hold the other party harmless from any such causes of actions. The agreement to defend, indemnify and hold harmless as stated herein shall include hiring an attorney to defend, indemnify and hold harmless the other party, and paying all attorneys' fees, costs and expenses incurred in defending against those claims.

9.     If any term or provision of this Agreement and Release is invalid or unenforceable under any local, state, or federal law, statute, judicial decision, regulation, ordinance, executive order or other rule of law, such term shall be deemed reformed or deleted, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule and the remaining provisions of this Agreement and Releases shall remain in full force and effect. This Agreement and Releases have been negotiated at arms' length between persons knowledgeable in the matters dealt with herein, and each party has been or has the option to be represented by experienced and knowledgeable legal counsel. Accordingly, any rule of law, and all other statutes, legal decisions, or common law principles of similar effect, which would require interpretation of any ambiguities in this Agreement and Releases against the party whose counsel drafted it, are of no application and are hereby expressly waived. The provisions of this Agreement and Releases shall be interpreted in a reasonable manner to effect the intentions of the parties hereto, and shall be deemed to have been jointly drafted by Apreamare and FYI.

10.     This agreement shall be deemed to have been negotiated and entered into in Naples, Italy. Any and all claims or disputes arising out of or otherwise relating to this Agreement shall be governed and construed in accordance with Italian law only, and the parties expressly acknowledge and irrevocably agree that the sole and exclusive venue for and jurisdiction over any such matter shall be the courts of Naples, Italy to the exclusion of the courts of any other place, and hereby consent to jurisdiction in such court. If any causes of action is

brought to enforce or interpret the provisions of this Agreement the prevailing party shall be entitled to reasonable attorneys' fees in addition to any other relief to which that party may be entitled.

11.   **Counter-Parts.**  The parties hereto may execute this Agreement and Releases in whole or counterparts, and execution of counterparts shall have the same force and effect as if the Settling Parties had signed the same instrument. Further, signatures transmitted by email or facsimile shall have the same effect as original signatures.

**IN WITNESS HEREOF**, the undersigned, being duly authorized, have caused this Agreement and Releases to be executed on the dates shown below:

APREAMARE, S.P.A.

By: _____
    Cataldo Aprea

Title: _____

Dated: _____

MYI INTERNATIONAL, INC.
d/b/a FLORIDA YACHTS
INTERNATIONAL

By: _____
    Ralph Navarro

Title: _CEO_____

Dated: _7-15-2012_____

308017.1

# Exhibit "A"

# IV. FINDINGS AND RECOMMENDATIONS.

Deficiencies noted under "SAFETY" should be addressed before vessel is next underway. These findings represent an endangerment to personnel and/or the vessel's safe and proper operating condition. Findings may also be in violation of U.S.C.G. regulations.

All deficiencies should be corrected in the near future so as to maintain standards and to help the vessel to retain it's value.

Deficiencies will be listed under the appropriate heading:

### Safety Deficiencies:

1. No U.S.C.G.-Approved Personal Flotation Devices ("PFD") were sighted on board.
*Comply with U.S.C.G. Provide approved life jackets.*
*CFR Title 33 part 175 subpart B.*

2. Six (6) hand-held (portable) fire extinguishers were found on board, all either lacking or having expired inspection tags.
*Comply with U.S.C.G., N.F.P.A. by testing and tagging all fire extinguishers as per A.B.Y.C. A-4. Ap. 5d.*

3. No Visual Distress Signals (VDS/flares) were sighted on board.
*Comply with U.S.C.G. regulations, provide approved VDS. CFR 175.125.*

4. At time of survey, the captain was unable to illuminate the navigation lights (via the Telemecanique Magelis Smart user interface).
*Have a qualified marine electronics technician further investigate and service or replace as per discovery. Prove navigation lights operable.*

5. The service tag indicated that the inspection for the fixed fire extinguishing system in the engine room has expired.
*Comply with U.S.C.G. for fire suppression equipment aboard un-inspected vessels by testing, servicing and tagging system.*

6. The Life Rafts Inspections have expired.
*Comply with U.S.C.G. for safety equipment aboard un-inspected vessels by testing, servicing and tagging Life Rafts annually at a Factory Authorized Service Facility.*

---



# IV. FINDINGS AND RECOMMENDATIONS

### Engine Room Deficiencies & Observations:

7.   The main engines raw water intake seacocks were found to be either stiff (difficult to operate) or inoperative.
*Service seacocks. It is recommended that all below water line thru-hull penetrations be monitored frequently for both operation and condition.*

8.   All raw water intake seacocks sighted on board were not connected to the vessel's bonding system.
*Have a qualified marine technician connect all seacocks to the vessel's bonding system.*

9.   The Idromar International watermaker located aft in the engine room to starboard was found to be in need of maintenance.
*Have a qualified HRO watermaker specialist service watermaker system.*

10.   The manifold valves for the air conditioning chiller system (located aft in the engine room) were leaking raw water at the connections (salt residue sighted).
*Service or replace connections as necessary.  Clean area.*

11.   The rotary knobs for the three (3) battery switches located at the Crew Corridor (aft ship) were missing.
*Supply and install battery switch rotary knobs.*

### Transom Garage Deficiencies & Observations:

12.   The upper gasket/sealant for the transom garage door was missing (missing segment approximately 10 feet in length).
*Replace transom door gasket/sealant.*

13.   A courtesy light fixture was missing in the transom garage.
*Supply and install light fixture.*

### Exterior Deficiencies & Observations:

14.   Signs of deterioration (air pockets and bubbles between the tempered glass layers) were sighted at three panel windows located at the main cabin sides (one on the portside and two on the starboard side).
*Replace windows.*



# IV. FINDINGS AND RECOMMENDATIONS

*Exterior Deficiencies & Observations (CONT):*

15. All exterior teak decks and surfaces (including the swim platform, cockpit deck, side decks, and forward deck) were found to be in need of maintenance.
*Service teak as necessary.*

16. The electro-hydraulic pasarelle located outboard transom to starboard tested inoperative.
*Have a qualified marine technician further investigate and service or replace as per discovery. Prove operational.*

17. The security lock/latch on the starboard boarding door (mid-ship) was damaged.
*Replace security lock/latch.*

18. Two (2) hatch/locker doors located outboard transom to starboard (below the steps) were missing. Additionally, one (1) hatch/locker door located outboard transom to port (below the steps) was missing.
*Supply and install hatch/locker doors.*

19. The electro-hydraulic retractable canvas top located at the Flybridge tested inoperative.
*Have a qualified marine technician further investigate and service or replace as necessary.*

20. The Frigomar automatic ice maker located at the flybridge tested inoperative.
*Have a marine refrigeration technician further investigate and service or replace as necessary.*

21. The electric range/grill has been removed from the flybridge.
*Supply and install electric range/grill as deemed necessary.*

22. The bench seat and sun pad cushions located at the flybridge and forward deck were found to be stained/soiled.
*Clean or renew cushions as deemed necessary.*



# IV. FINDINGS AND RECOMMENDATIONS

*Exterior Deficiencies & Observations (CONT):*

23. The application of the caulking/sealant surrounding the forward ship, mid-ship, and forward cockpit hawse pipes was found to be sub-standard (too thick). Additionally, the caulking/sealant surrounding the forward ship and aft ship hawse pipes has deteriorated.
*Renew interior and exterior caulking/sealant surrounding all hawse pipes.*

24. Three (3) push-button latches located at the flybridge cabinet were defective.
*Replace defective hardware.*

*Interior Deficiencies & Observations:*

25. The Indel Marine compact refrigerator located at the Main Salon Service Bar tested inoperative.
*Have a marine refrigeration technician further investigate and service or replace as per discovery.*

26. The Frigomar automatic ice maker located at the Main Salon Service Bar tested inoperative.
*Have a marine refrigeration technician further investigate and service or replace as per discovery.*

*Out-of-Water Inspection Deficiencies & Observations:*

27. This vessel's chine (the entire length of the vessel on both the port and starboard sides) was found to be soft (condition consistent with delamination). Additionally, several cracks ranging from 6" to 12" inches in length were sighted at the chine (where the travel-lift straps would normally be situated).
*Further investigate (invasive/destructive testing may be required) to determine the full extent of the delamination and have a qualified FRP specialist repair as per discovery.*



# IV. FINDINGS AND RECOMMENDATIONS

<u>*Out-of-Water Inspection Deficiencies & Observations (CONT):*</u>

28. This vessel's bottom strakes (mid-ship and forward thereof on both the port and starboard bottom sides) were found to be soft (condition consistent with delamination).
*Further investigate (invasive/destructive testing may be required) to determine the full extent of the delamination and have a qualified FRP specialist repair as per discovery.*

29. Signs of sub-standard prior repairs (non-matching paint color/tones) were sighted in thirteen (13) different areas throughout the transom and hullsides. The effected areas ranged from 12 to 24 inches in diameter.
*Properly prepare surfaces and renew exterior paint.*

30. Signs of deterioration (air pockets and bubbles between the tempered glass layers) were sighted at the two hullside windows (one on the port hullside and one on the starboard hullside).
*Replace hullside windows.*

31. FRP cracks and separations were sighted just below the metal rub-rail (at the exterior jointure between the hullside and the crown teak cover) surrounding the entire main deck.
*Have a qualified boat yard further investigate and repair as necessary.*

32. Dents, distortions, and nicks were sighted at the port and starboard propeller blades.
*Recondition propellers.*

33. The port and starboard cutless bearings were observed to be past their limits of effectiveness.
*Replace cutless bearings.*

34. The underwater gear and FRP bottom black anti-fouling paints were found to be past their limits of effectiveness. Additionally, a build-up of prior layers of anti-fouling paint was noted.
*Remove prior coats of bottom paint and properly prep wet bottom surface. Renew FRP and appendages anti-fouling paints as necessary.*

35. The stainless steel anchor backing plate was not properly sealed. Consequently, surface corrosion was visible on the underside.
*Remove anchor backing plate. Remove surface corrosion and apply a protective coating. Properly remount and seal anchor backing plate.*

# IV. FINDINGS AND RECOMMENDATIONS.

**_Out-of-Water Inspection Deficiencies & Observations (CONT)_:**

36. The paddle wheel located at the forward transducer was damaged.
*Replace paddle wheel.*

37. Approximately ten (10) FRP chips, each roughly ½" in diameter, were sighted at the bow (on the boot stripe).
*Have an FRP specialist repair as necessary.*

38. No protective guards/railings were sighted at the bow or stern thruster tunnels.
*For your information.*

39. Four (4) underwater lights sighted at the transom failed to illuminate.
*Service or replace as necessary.*

**_Run Trial Deficiencies & Observations_:**

40. During the run trial, the port main engine reached 2,130 RPM at full throttle and the starboard main engine reached 2,080 RPM at full throttle. The manufacturer's recommended RPM for these engines at full throttle is 2,450 RPM.
*This result could be caused by a wide array of factors. Some common causes are poor fuel condition, soiled fuel filters, inadequate propellers (size, pitch), poor shaft alignment, lack of paint or cleanliness on wet bottom surface, improperly tuned diesel engines, etc.*

41. Abnormal vibrations were noted at cruising speed and maximum throttle.
*Target alignment of running gear. See Finding #32.*

42. The Telemecanique Magelis Smart digital display and monitoring system located at the Flybridge Helm Station tested inoperative (display indicated "No Input").   Additionally, the Telemecanique Magelis Smart digital display and monitoring system located at the Lower Helm Station failed to operate properly (some functions operated while others were unresponsive)
*Have a qualified marine electronics technician further investigate and service or replace as per discovery.*

---



# IV. FINDINGS AND RECOMMENDATIONS

***Run Trial Deficiencies & Observations (CONT):***

**43:  The VHF has been removed from the Flybridge Helm Station.**
***Supply and install VHF as necessary.***

# Exhibit "B"

## IV. FINDINGS AND RECOMMENDATIONS

Deficiencies noted under "SAFETY" should be addressed before vessel is next underway. These findings represent an endangerment to personnel and/or the vessel's safe and proper operating condition. Findings may also be in violation of U.S.C.G. regulations.

All deficiencies should be corrected in the near future so as to maintain standards and to help the vessel to retain it's value.

Deficiencies will be listed under the appropriate heading:

*Safety Deficiencies*:

1. No "PFD" Personal Flotation Devices were sighted on board.
*Comply with U.S.C.G.  Provide approved life jackets.*
*CFR Title 33 part 175 subpart B.*

2. No throwable (Type IV) Personal Flotation Devices sighted on board.
*Comply with U.S.C.G.  Provide approved Type IV throwable "PFD'S".*
*CFR Title 33 part 175.15.*

3. Five (5) hand-held (portable) fire extinguishers were found on board, all either lacking or having expired inspection tags.
*Comply with U.S.C.G., N.F.P.A. by testing and tagging all fire extinguishers as per A.B.Y.C. A-4. Ap. 5d.*

4. No Visual Distress Signals (VDS/flares) were sighted on board.
*Comply with U.S.C.G. regulations, provide approved VDS.  CFR 175.125.*

5. The service tag indicated that the inspection for the fixed fire extinguishing system in the engine room has expired.
*Comply with U.S.C.G. for fire suppression equipment aboard un-inspected vessels by testing, servicing and tagging system.*

*Engine Room Deficiencies & Observations*:

6. No "No Oil Discharge" Plaque sighted.
*Supply and install a U.S.C.G. "NO DISCHARGE OF OIL" placard.  CFR 155.770.*

---



# IV. FINDINGS AND RECOMMENDATIONS

### *Engine Room Deficiencies & Observations (CONT):*

7. The raw water intake hoses for the port and starboard main engines have deteriorated (exterior cracks visible).
*Replace raw water intake hoses and associated clamps.*

8. The main engines raw water strainers were found to be in need of maintenance.
*Service strainers as necessary.*

9. The belt guard for the starboard main engine was missing.
*Supply and install belt guard.*

10. No fans or power blowers were sighted in the engine room.
*Power ventilation is not required on vessels equipped with diesel engines, however, it may be used to control compartment temperature, odor, and for personnel comfort while servicing the equipment.*

11. Unsecured flex-tubing was sighted outboard in the engine room to port and starboard.
*Properly route and secure flex-tubing as necessary.*

12. The Air Sep air filters were found to be soiled.
*Service or replace air filters as necessary.*

13. The main engines and generator zinc anodes were found to be past their limits of effectiveness.
*Replace all engine zincs on board.*

### *Exterior Deficiencies & Observations:*

14. All exterior teak decks and surfaces (including the swim platform, cockpit deck, side decks, forward deck, etc.) were found to be in need of maintenance.
*Service teak as necessary.*

15. The shore power cablemaster powered up, however it tested inoperative (failed to release or retract shore power cord).
*Further investigate and service or replace as necessary.*
*Clean and lubricate shore power cord and cablemaster system.*



# IV. FINDINGS AND RECOMMENDATIONS

*Exterior Deficiencies & Observations (CONT):*

16. Water was sighted within the surveillance camera located at the antenna mast.
*Service or replace as deemed necessary.*

17. At time of survey, the custom wooden table for the cockpit was not mounted (sighted stored at the Galley). Consequently, it was not inspected for condition or proper fit.
*For your information.*

18. At time of survey, the sun pad cushions were not mounted (cushions sighted stored in the Forward Stateroom). Consequently, they were not inspected for condition or proper fit.
*For your Information.*

19. The exterior of this vessel (including the hullsides) was found to be in need of detailing.
*Detail (wash, polish, wax, etc.) as necessary.*

*Interior Deficiencies & Observations:*

20. No "No Trash Dumping and Plan" Plaque sighted.
*Supply and install placard in order to comply with U.S.C.G. regulations for Trash Dumping and Plan.*

21. At time of survey, the fresh water tank was empty and a source of fresh water was not available at the vessel's location. Consequently, the fresh water system (including all faucets, wash downs, sinks, showers, heads, etc.) could not be tested for operation.
*Fill fresh water tank and prove entire fresh water system operable.*

22. The Frigomar automatic ice maker located at the Helm Station area tested inoperative (failed to cool).
*Have a marine refrigeration technician further investigate and service or replace as necessary.*



# IV. FINDINGS AND RECOMMENDATIONS

*Out-of-Water Inspection Deficiencies & Observations:*

23. The underwater gear and FRP bottom black anti-fouling paints were found to be past their limits of effectiveness.
*Renew FRP and appendages anti-fouling paints as necessary.*

*Run Trial Deficiencies & Observations:*

24. During the run trial, the port main engine reached 2,750 RPM at full throttle and the starboard main engine reached 2,740 RPM at full throttle. The manufacturer's recommended RPM for these engines at full throttle is 3,000 RPM.
*This result could be caused by a wide array of factors. Some common causes are poor fuel condition, soiled fuel filters, inadequate propellers (size, pitch), poor shaft alignment, lack of paint or cleanliness on wet bottom surface, improperly tuned diesel engines, etc.*



# Exhibit "C"

## LIMITED WARRANTY   [for United States Only]

**COVERAGE.**  APREAMARE S.P.A. ("APREAMARE") warrants that each APREAMARE yacht purchased from an authorized APREAMARE dealer, when properly used and maintained, will be free from defects in material and workmanship for a period of twenty-four (24) months from the date of delivery to the first retail Purchaser (the "Owner"), The APREAMARE twenty-four (24) month warranty is referred to herein as "the limited warranty." The Owner's sole and exclusive remedy under this limited warranty for defects in an APREAMARE yacht shall be the repair or replacement, in APREAMARE's sole discretion, of the defective part or component.

**NOT COVERED.**  This limited warranty does not apply to, and APREAMARE shall have no liability or responsibility in respect of, damages or expenses relating to defects (1) caused by the failure to use, maintain or store the APREAMARE yacht as specified in the warranty booklet, service booklet, manuals or other literature supplied to the Owner, or (2) in components and parts (including, but not limited to, engines, marine gears, generators, batteries, electronics, appliances, air conditioning systems, gangways, cranes, moving roofs and tops, lift platforms, etc.) furnished by third-party manufacturers and distributors which are covered by separate warranties directly from their manufacturers and distributors and which were provided to Owner with the "APREAMARE Bag", are available on the component manufacturer's website, product packaging or other mean of communication to the public. APREAMARE passes on, and hereby assigns, all warranties provided by such third-party component part manufacturers and distributors to the Owner.

This limited warranty also does not apply to, and APREAMARE shall have no liability or responsibility in respect of, damages or expenses relating to:

- commercial, rental, charter or other non-consumer or non-pleasure service;
- a yacht purchased from any party other than an authorized APREAMARE dealer; however, the warranty will be transferable from the first Owner to a subsequent purchaser in accordance with the terms and conditions set forth herein;
- a yacht, including components and systems, that has been altered, changed or modified from factory specifications;
- equipment and accessories not installed by APREAMARE;
- damage from osmosis blistering if the original gel surface has been altered in any way, or in the event the Owner cannot produce documentation establishing that the renewal and reapplication of antifouling paint was performed yearly by an authorized APREAMARE service center;
- damage or deterioration of cosmetic surface finishes, including cracking, crazing, discoloration, tearing, fading or oxidation of gel coat, wood finishes (varnishes, stains and paints), fabrics, plated or painted metal and stainless steel finishes; anti-fouling bottom paint or zinc anodes;
- the cost to remove, disassemble or reinstall components not installed by APREAMARE that require removal to access parts covered by this limited warranty;
- defects caused by incorrect or careless piloting of the vessel, specifically including but not limited to adverse weather/sea conditions.
- defects on components not installed on the vessel or APREAMARE and any defects arising on the vessel due to the installation or use of said components on board.
- apparent differences between furnishings, colours, fabric types and other materials or components and those shown, for information purposes only, in advertisements and catalogues, as well as apparent differences in the equipment options and fittings on your vessel that were not the subject of specific objection during the pre-delivery inspection.
- transportation costs and expenses for taking the vessel to and from the boatyard where the Warranty work will be performed.
- accidents, misuse, abuse, abnormal use, improper use, negligent use, wilful misconduct, lack of reasonable or proper maintenance or storage, failure to protect the vessel from the elements, repairs improperly performed or replacement parts or accessories not conforming to APREAMARE's specifications, use exceeding the recommended and permitted limits of the vessel, including commercial use, military use, or use in sporting competitions of any nature whatsoever, and/or normal wear or deterioration occasioned by the use of the yacht;
- any representation or implication relating to speed, range, fuel consumption or estimated performance characteristics;
- window glass and windshield damage or breakage;
- damage, shrinkage or deterioration of carpet, upholstery, and exterior canvas tops, enclosures, and weather covers;

- any defect or non-conformity that has not been timely and promptly communicated in writing to APREAMARE or to the Dealer who sold the vessel, and in all cases, no more than thirty (30) days from the discovery thereof.
- damages caused by handling of the yacht during shipping of the yacht;
- mal-adjustment of customer controls or other acts, after shipment, which are beyond the reasonable control of APREAMARE.
- any damage, cost or expense caused by Act of God; or
- loss of time, loss of use, inconvenience, travel expense, costs related to procuring any substitute yacht, transportation costs, towing, any incidental or consequential damages arising out of the non-use of the yacht, or compensation for inconvenience or loss of use while the yacht is being repaired or otherwise not available, or other matters not specifically covered hereunder.

**PROCEDURE.** In the event of a defect covered by this limited warranty, the Owner shall contact an authorized APREAMARE dealer. All warranty repairs must be performed exclusively at an APREAMARE Dealer's servicing location or at another servicing facility pre-approved in writing by APREAMARE. To obtain warranty service for your APREAMARE yacht, including any allegedly defective part, your specific and detailed claim must be reported to and received by the authorized APREAMARE dealer in accordance with the terms of this Limited Warranty and within the applicable warranty period. APREAMARE must approve, in advance and in writing, all repairs covered under or performed pursuant to this limited warranty. The Owner is responsible for all expenses associated with transporting the APREAMARE yacht and/or defective part to and from the APREAMARE service location. Upon retrieving your boat after warranty service, please confirm that all repairs have been completed to your satisfaction, and sign the warranty acceptance statement.

**DAMAGES.** Except as expressly provided by this Limited Warranty, **APREAMARE SHALL NOT BE RESPONSIBLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES ASSOCIATED WITH THE USE OF THE APREAMARE YACHT OR A CLAIM UNDER THIS AGREEMENT, WHETHER THE CLAIM IS BASED ON CONTRACT, TORT OR OTHERWISE.** The foregoing statements of warranty are exclusive and lieu of all other remedies. Some states do not allow the exclusion or limitation of incidental or consequential damages, so this limitation or exclusion may not apply to you.

**DISCLAIMER. ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ALL IMPLIED WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE OF TRADE, BY STATUTE OR OTHERWISE, IS HEREBY STRICTLY LIMITED TO THE TERM OF THIS WRITTEN WARRANTY.** This Agreement shall be the sole and exclusive remedy available to the Owner with respect to this yacht. In the event of any alleged breach of any warranty or any legal action brought by the purchaser based on alleged negligence or other tortious conduct by APREAMARE, the Owners sole and exclusive remedy will be repair or replacement of defective materials as stated above. No dealer and no other agent or employee of APREAMARE is authorized to modify, extend or enlarge this warranty.

**TRANSFER OF LIMITED WARRANTY.** This warranty is made by APREAMARE with only first Owner of the yacht and does not extend to any third parties. The unexpired portion of this limited warranty may be transferred to subsequent owners upon proper notification to APREAMARE of the change of ownership. As an express condition to the transfer of such warranty to a subsequent purchaser, the "notification of transfer of ownership" form provided in the Service Booklet must, within fifteen (15) days of such transfer of ownership, be properly completed and returned to APREAMARE by reputable overnight courier (such as Federal Express or DHL) to:

> Apreamare S.p.A.
> via Terragneta, 72
> 80058 Torre Annunziata (NA)
> Italy

To approve the Warranty Transfer, a detailed survey must be done by an APREAMARE Official Dealer at the charge of the subsequent Owner. A written request for a survey must be submitted to APREAMARE within fifteen (15) days of the resale. APREAMARE reserves the right to reject a warranty transfer request for an APREAMARE yacht that has been damaged, neglected or otherwise previously excluded from warranty coverage or for failure to otherwise follow this warranty transfer procedure. In order to be effective, APREAMARE must confirm all warranty transfers in writing to the dealer and the subsequent owner.

**APPLICABLE LAW.** Any and all claims or disputes of whatever nature arising out of or otherwise relating to this warranty shall be governed by and construed in accordance with the laws of the Republic of Italy only, and the parties expressly acknowledge and irrevocably agree that the sole and exclusive venue for and jurisdiction

over any such claim or dispute shall be the courts of Naples, Italy to the exclusion of the jurisdiction of the courts of any other place.

This limited warranty expressly incorporates, supersedes and/or replaces all representations set forth by APREAMARE with regard to the yacht, including but not limited to APREAMARE's product literature, marketing materials, advertisements and technical specifications.

All terms of this limited warranty are contractual, and not mere recitals, and constitute material terms of this limited warranty.

**OTHER RIGHTS. Your acceptance of delivery of the warranted APREAMARE yacht constitutes your acceptance of the terms of this limited warranty.** This warranty gives you specific legal rights, and you may also have other rights which vary from state to state. Nothing herein shall limit or prevent an APREAMARE Dealer from giving its own warranty, provided that any warranty of Dealer shall be separately and conspicuously identified as being that of Dealer and not a warranty of APREAMARE. However, APREAMARE assumes no responsibility, liability or obligation for any warranty issued by the Dealer or any other entity.

**ENTIRE AGREEMENT.** This document contains the entire warranty given by APREAMARE in respect of your APREAMARE yacht and there are no terms, promises, conditions or warranties regarding your APREAMARE yacht other than those contained herein. APREAMARE specifically does not authorize any person to extend the time or scope of this warranty or to create or assume for APREAMARE any other obligation or liability with respect to APREAMARE yachts.

**WARRANTY FOR THIRD PARTY COMPONENTS SUCH AS, BY WAY OF NON-LIMITING EXAMPLE, ENGINES, MARINE GEARS, APPLIANCES, GENERATORS, ELECTRONICS, AIR CONDITIONING SYSTEMS, GANGWAYS, CRANES, MOVING ROOFS AND TOPS, LIFT PLATFORMS, ETC.**

The warranties for such third party components are provided to Yacht Owners exclusively by their respective manufacturers as set forth by the terms and conditions in their specific warranties. The terms and conditions of said Warranties are found in the Warranty Certificates supplied by the Manufacturers of these components and which were provided to the Owner inside the "APREAMARE Bag", are available on the component manufacturer's website, product packaging or other mean of communication to the public. APREAMARE passes on, and hereby assigns, all warranties provided by such third-party component part manufacturers and distributors to the Owner. It is expressly understood and agreed that APREAMARE shall have no responsibility, liability or obligation whatsoever for any defect in such third party components. In order to qualify for the warranty under any Standard Warranties provided by manufacturers of any third-party components installed on your vessel, it may be necessary to send the warranty registration card or other documentation to that manufacturer. Please carefully read such Warranties and follow their instructions.